May it please the court, my name is Catherine Doy and I represent the Appellants California Association of Rural Health Clinics and Avenal Community Health Center in this appeal. With the court's permission, I would like to reserve seven minutes for rebuttal. Distilled to its essence, the question presented by appellants on appeal is actually quite simple. Namely, what did Congress intend when it stated in 42 USC, section 1396 DL1, in defining the scope of rural health clinic services that must be reimbursed by Medicaid. That those services would have the meaning given to rural health clinic services in section 1395 XAA, which is the Medicare definition of required rural health clinic services. May I just ask at the beginning, if the RHCs and the FQHCs, the federal, are operating pursuant to Medicaid, why should we look anywhere else but to the Medicaid statute to define physician services? It's because Congress provided in section 1396 DL1 that the meaning to be given rural health RHC services for the purposes of defining the benefits for the purposes of Medicaid would be the meaning given to those services. In section 1395 XAA, which is the Medicare statute. And it's our contention that the meaning within, the only meaning given to RHC services in 1395 XAA is the definition of rural health clinic services under Medicare, which includes the Medicare definition of physician services. Well then how do we get around the fact that in defining physician services, Medicaid refers to a specific provision of Medicare that limits physicians to doctors of medicine and osteopathy? Okay, so this, to take a step back, we go to section 1396A of the Medicaid statute. And 1396AA says that the contents, a state plan for medical assistance must, and then in paragraph, subparagraph 10, capital A, provide for making medical assistance available including at least the care and services listed in paragraphs 1 through 5, 17 and 21 of section 1396DA of this title. Paragraph 2 of section 1396DA defines FQHC and RHC services as a benefit that Medicaid must reimburse FQHCs and RHCs for. And a parallel provision, section 1396DA5, defines physician services. So for the purposes of Medicaid generally and all Medicaid providers, at a minimum, Medicaid must reimburse the providers for physician services as defined in 1396DA5, which is restricted to doctors of medicine and osteopathy. And what is, so in practical effect, what would that apply to? What's Medicaid generally? Non-FQHCs and RHCs, so a hospital that provides services to Medicaid patients, other kinds of clinics that are not FQHCs and RHCs and don't receive federal grant money under section 330 of the Public Services Act. Physicians that are not working in connection with an FQHC or RHC. Those are all the types of providers that will only be reimbursed for medicine and osteopathy. So if you're in a hospital, and you're getting Medicaid, would you get the services of a- Podiatrist or- Yes, yes. Yes, your honor. It's our contention that those services, optometry, podiatry and chiropractic, I'm forgetting the fifth one. Dental. Dental, thank you. Dental surgery could be potentially performed in another outpatient setting or in a hospital or in another setting that's not an FQHC or RHC setting. And because the definition of physician services in section 1396 DA5 is a general definition that applies to Medicaid generally. But the definition of physician services and rural health clinic services in section 1396 DA2 is specific to defining the federally qualified health clinic and rural health center services, that that specific definition would not be nullified by the general provision in 1396 DA5 that limits physician services. So rural health clinics could be reimbursed for optometry and chiropractic services and podiatry and so forth. And physician's assistants or nurse practitioners and so forth would still be covered by the rural health clinics. Yes, your honor. Everything contained in the definition of rural health clinic services under the Medicare 1395 XAA would be, is required to be reimbursed by Medicaid when provided by FQHCs and RHCs to Medicaid patients. And this is actually consistent with the purpose of, or the special purpose of FQHCs and RHCs because they're required to participate in the Medicare program. And they're required to provide services they provide to Medicare patients or And so the grant under the Public Services Act is intended to reimburse them for the services provided to patients with no insurance at all. And if Medicaid is not required to pay for those services that they are required to provide, because they are required to provide them to Medicare services, the result is basically a subsidization of the Medicaid program by the Public Services Act program. So 42 U.S.C.A section 1396 D.A. 5, which is the physician services definition. For Medicaid generally. For what you call Medicaid generally. Does that control then, I mean does that define then inpatient hospital services as listed in number one? Does that relate back to number one? Actually, it's a separate. Where, because you just said that hospitals do get all of the doctor services. Where is that set forth? Okay. Under Medicaid. Okay. Paragraph one of 1396 DA is hospital inpatient services. Right. And that is a separate benefit that's required to be reimbursed by Medicaid than the physician services. And actually, I may have misspoken earlier because in the healthcare industry, hospital services are billed independently of physician services. So there, but if a physician was providing the service in the hospital, the physician services would only be reimbursable by Medicaid if it was provided by doctor of medicine or osteopathy. And then the hospital services would be separately charged as hospital services. And those are required to be reimbursed by Medicaid under section 1396 DA 1. And so, in the same sense, FQHC and RHC services, because they're defined in 1396 DA 2, are to be considered separately and the obligation is specific to that section. And it is, in this case, redundant with section 1396 DA 5, because physician services, the doctors of medicine and osteopathy services provided in a clinic are reimbursable under either scheme, or under either provision, but because of the definition of FQHC and RHC, the services of the other types of physicians are also required to be reimbursed by Medicaid in the FQHC and RHC context. So the state has spoken and said they're not going to pay because of budget cuts or whatever their reasons, but probably the economic situation. They're not going to pay the rural healthcare clinic services, physician services, beyond what is defined in part five. You all have objected and that's the result of this lawsuit, is that correct, that has resulted in this lawsuit. The plan, the California plan was going to be submitted. Apparently, it was submitted for approval and it has been approved? Yes, your honor. The legislation in question went into effect in July of 2009. We filed the lawsuit in early 2010. Judge Demrell issued his decision in order in October of 2010 and he enjoined the state's refusal to reimburse FQHCs and RHCs for these services until such time, if ever, that the state plan amendment was approved. And that was approved in May of May 23, 2011. So there was a period of time of, I think it's about eight months, that the services were being paid for pursuant to Judge Demrell's injunction. Well, and so what's the effect of that approval? The effect of the approval we submit is not significant because the actual document that is, that constituted approval was a one page, two paragraph document that simply said we approve the state plan amendment. And under the, that kind of federal action, even though we could bring potentially an Administrative Procedures Act challenge to that, it's not determinative in this case for a couple of reasons. First, because as a matter of law, Congress has defined FQHC and RHC services for the purposes of Medicaid under section 1396DL1 and by definition 1395XAA, and so it's not a question of an interpretation by an agency. The agency action was wrong. In addition, even if the court found that the agency action was, or the Congress did not speak definitively on the subject, but it was subject to agency interpretation, in this case, the one page document that contained no analysis would not be subject to any deference by the court. Well, that's what I'm wondering. I mean, we wouldn't, why wouldn't we give it deference or why should we give it no deference? Well, under the Chevron doctrine, the first step is to see whether or not Congress has clearly and expressly spoken on the issue. And so our position is that Congress did, and therefore there's no interpretation necessary. But also under Chevron, if you get past that first step, the agency action is subject to deference as long as it's a reasonable interpretation of the statute, but only if the agency action is a result of formal adjudication or rulemaking. In other words, only if it has those hallmarks of the interested parties having the opportunity for notice and the opportunity to be heard, a record to be developed, and a formal decision of the agency that includes its reasoning. Well, so that's, so this isn't here as an agency appeal, right? I mean, we're not, this isn't here under challenging. Under the APA. Right, this came to us differently. So do we go through those steps? Well, that's the question I think that was presented in the Supreme Court opinion in the independent living case, where the providers in that case had brought an action under the supremacy clause. And the question there was whether or not after the CMS approved the state plan amendment, they had to go back and bring an action under the Administrative Procedures Act. But this case is fundamentally different than the situation in the independent living case, because the plaintiffs here, the appellants, had a right of action under Section 1983, an independent right of action that is not subject to question in the way that an action brought purely under the supremacy clause is being questioned by the Supreme Court. And in fact, the dissent in the independent living case expressed concern that allowing actions to be brought purely under the supremacy clause would constitute a complete end run around Section 1983 and the implied right of action that has been recognized by the Supreme Court. Because this was a 1983 action, and because it was ripe at the time that the plaintiffs brought it, back in 2010, and the APA action did not even become ripe, if indeed there is one at this point, until May of 2011, it does not serve the interest of justice or the efficient use of judicial resources to now make these plaintiffs go back and bring an APA cause of action when there are a host of questions about deference. And in fact, this is just strictly a question of the correct construction of the statute, which we contend requires this court to find that physician services in the Medicaid context that must be reimbursed is the broader scope of physician services in 1395 XR. Did you want to reserve the balance of your time? Yes, I did. Thank you. Okay. Good morning. Susan Carson from the Office of the Attorney General, representing Toby Douglas, who is now the Director of the Department of Healthcare Services. Judge McGee, I think you've hit the nail on the head. Since appellants filed this lawsuit and the district court has issued its decision, the landscape has changed. CMS, the federal agency charged by Congress to implement and administer the Medicaid program and the Medicare program, has approved the state's changes to its Medicaid state plan. So now, appellants are here using the wrong vehicle against the wrong defendant. What they should do now is file an action against CMS, the Centers for Medicare and Medicaid Services, and under the Administrative Procedures Act. That's a highly deferential standard to CMS, but that should be their sole remedy. What's the, I guess, what's the authority or what, is there any authority that says we can't go forward with this at this point in time, how it's been presented? I believe so, Your Honor. This court has recognized in the Alaska case, which is it? Which Alaska case? I'm sorry. That's Alaska, I think it's Alaska, the state of Alaska Department of Health, Social and Health Services versus CMS. The site is 424 F 3rd. And it's not cited, right? I believe that it is in one of the briefs, but I'm not sure. Okay. At this point, I'm not sure. So in that case- Well, if it is not, please submit it to the court and to opposing counsel. Yes, I will, Your Honor. In that case, this court said that the CMS's disapproval in that case of a state plan amendment was entitled to Chevron deference. And we posit that Chevron deference does apply here. Congress has specifically delegated the authority to make these kinds of determinations to the, well, the US Department of Health and Human Services, which then- Chevron deference does apply here because it would apply if it came up through the APA type of action, or Chevron deference applies here now? Chevron deference applies here now. In other words, the state is entitled to rely on CMS's approval of these state plans. And that's, your authority for that is the Alaska case? Yes, Your Honor. Okay. All right. Thank you. I just wanted to make sure. Sure. And so, Congress has delegated the authority to make these determinations about states' requests to amend their Medicaid state plans, has delegated that authority, I think in the Department of Health and Human Services, which in turn uses the agency CMS, and CMS has exercised that authority here. So the state, given the way the quasi-contractual relationship works in the Medicaid program between the federal government and the state, the state is entitled to rely on that approval. And that should be determinative under Chevron. And that's the two-paragraph approval that your opposing counsel was talking about? Well, first of all, the record that was in front of CMS is not before this Court and was not before the District Court. So we don't know all the back and forth. I do know from my experience in working on these other types of cases that there often is back and forth, and I believe there, somewhere in the record, is an indication that CMS did not automatically approve this state plan amendment, but asked for additional information and then eventually approved it in May of 2011, retroactive to July 1, 2009. Is that in the record, that they asked for additional information? I believe so, Your Honor. I don't know exactly where it is, but I think it's in the briefing and that it was indicated. It didn't say what the information requested was. The way the system works generally is that if a state plan amendment is submitted to CMS and no request for additional information is made by CMS to the state, it's automatically approved. And I understand there's some reference in the record that within that 90-day period, CMS did ask, indicated that they would not approve it as it was originally written and requested additional information. And they revised it? I don't know. We don't have the record before us because this is not an APA action in which, against the feds, federal government, in which we would have the record. Are there any other states that are doing this that there's some other precedent we can look at in terms of what's happening? Well, state plan amendments are submitted by all 50 states all the time. This is the way the system works. Is there anyone who's focusing on this rural health care clinic provision? Not that I'm aware of, Your Honor. But I would posit that we don't need to guess anymore. This is an incredibly complicated statutory scheme, as your questions have indicated. It's complicated, but let's talk about that. Let's go ahead and deal with the statutory scheme. Because it, I just want to make sure I understand your way to read this provision. Because it seems like this scheme directs the reader to follow a path in defining terms. Correct? Correct. Okay. Particularly rural health clinic and federal qualified health center. And if the Medicaid language to which you point specifically directs the reader to the exception L1, is that right? That's correct. Okay. Makes no exception for one type of physician or another. Why would we read in such an exception now? Well, I think that, I think it's important to take a step back and to look at the program and to look at where rural health clinics and FQHCs fit in. So those are clinics that are funded through grants by the federal government. They have Medicare patients, so they receive reimbursement for Medicare, private insurance, and also Medicaid. And so they're required to provide certain level of service, or they choose the level of services they would like to choose. So in other words, they don't have to provide everything. Then on the other side is Medicaid, in which we have, I think, six or seven mandatory services and all the others are optional. If we were to read this the way the appellants are requesting, which Judge Damrell rejected, we would then be automatically turning dental, as opposed, generally adult dental services, not just the federally required ones, and podiatry and chiropractic services into mandatory services. And under Medicaid, they are not. But you can think of reasons why they would for rural health care purposes. We could, but I think that we should go back. CMS is the agency that has the expertise. And is it charged with administering... And I'm sorry, when you say CMS, I just want to make sure. I'm sorry, sure. Centers for Medicare and Medicaid Services, which is the agency under the umbrella of the federal Department of Health Care Services, is charged specifically with making these kinds of decisions. And we and you, the court, are entitled to give their approval, which in essence adopts the Judge Damrell's decision and the state's position with regard to how this should be read. Well, you make a fair point, but I'm just looking at the language, which often courts are asked to do, to look at the language in the statute. And looking at the language of the statute, and especially when looking at the one provision, 42 U.S.C.A. section 1396D, which lists for purposes of the subchapter medical assistance and then the 1, 2, 3, 4, and 5, I mean, you read down to section 2, and you get to rural health clinics. I mean, it talks about outpatient hospital services consistent with state law permitting such services, rural health clinic services. And it says, as defined in subsection L1 of this section, and if you go to L1, you don't even get to 5. You continue reading here and go where it directs you to. If you go to L1 of this section, it tells you that the term rural health clinic services means physician services. And I think this is where the dispute is, because it sends you to the Medicare subchapter or section. And I guess the dispute is, you and your side say, well, yeah, physician services. So we jump back to Medicaid, which I don't know that typically you would jump back to a whole other section. Or do you stay within, see what physician services is within the Medicare statute, which is defined, physician services at 42 U.S.C.A. section 1395XQ, and then it lists, and R lists all of those services. So it's not illogical. I mean, when you read the statute to follow what it says, it seems jumping back to Medicaid seems odd to me. And I'm trying to figure out, because I think that's your view, why we would do so. Well, I think I have a couple of responses to that. First of all, again, CMS approved this change. I understand. Just put that aside for just a moment. Sure. So when you look at, I can't remember, whatever, the Medicare statute, it lists physician services, and then it says, and such ambulatory services as the state concludes in its state plan. Well, in Medicaid, podiatry and dental services and optometry are ambulatory services. So they are optional, and the Medicare statute even indicates that that definition for FQHCs and RHCs allows the state to determine what ambulatory services will be provided. Now, I will concede that it is very confusing, and I struggled vitally to understand. Well, it's not as confusing for me, but tell me, when you're talking about ambulatory services, where you're talking about. Can you just point me to it? I'm sorry, I don't have the statute right in front of me. Can you? Here, I have an extra copy of it. Here you go. Mm-hmm. I just want to make sure I know where you're referring to when you say, and. Sure. So on page two of this handout you just gave me. Yes. Of six. The term rural health clinic services means. Yes. And then A is physician services. And B. Oh, this isn't. Wait a minute. No, this isn't what I meant. I'm sorry. Because I have the same question. Why should Medicaid define physician services when it never uses that term in discussing the rural health clinics and the FQHC core services? Why should we? Well, I'm sorry, Your Honor. Why should Medicaid define physician services when it never uses that term in discussing RHC or FQHC core services? The, what are called core services are identified in 1396 D.L. Rural health clinics. Well, go ahead and answer Judge Monkia's question. Because mine, I believe, relates to that. Okay. So if we look at that provision, number one says rural health clinic services and rural health clinic have the meanings in 1396 A.A. And then there are exceptions. And it also indicates and with respect to other ambulatory care services, the sufficient arrangement required should only be as required to the state plan for those services. So and I think we have to go back to the Medicaid Act when we're talking about FQHCs, which is at 1396 D.A., which defines medical assistance to be. So it says consistent with state law permitting such services, rural health clinic services as defined in subsection L1 of this section and any other ambulatory services which are otherwise included in the plan. So under the Medicaid Act, podiatry, dental services and optometry, I mean, excuse me, chiropractic services are other ambulatory services. So it wouldn't make sense to require or to reimburse rural health clinics and FQHCs or only their Medicaid patients for services that CMS has approved can be eliminated from our state plan. In other words, with rural health clinics and FQHCs are reimbursed in myriad of ways. And their reimbursement scheme is very, very complicated based on their cost, based on visits. The only thing that the state can do is decide that it's going to eliminate some services and there is nothing in the statutory scheme to show, as Judge Jamreil found, to treat FQHCs and RHCs differently than any other kind of clinic or any other kind of provider here. Well, it seems like in your interpretation, the subsection to which you point that there's the A5, 42 U.S.C.A. section 1396 D.A. 5, you say that's what defines physician services? Yes, Your Honor. All right. But it seems like it's part of a list enumerating what services a plan must provide and I'm just trying to figure out why would we read one enumerated service as an implicit restriction on another and are there any other services listed in subsection A that have a similar effect? I'm not sure that I understand your question about similar effect. Well, you're saying that 5, subsection 5, modifies the part about rural health care services in 2A, right? Yes. And I think if you read it in the COLE context and understand that ambulatory services can be defined by a state in its state plan, under the Medicaid plan, that in the Medicaid scheme, the podiatry, dental services and chiropractic services are all ambulatory services. In other words, they're not included in what are physician services. They are separate and apart and they are optional Medicaid benefits. The state is not required to provide those. So but again, I've made the point but I would go back to the fact that the agency charged by Congress to make these very difficult determinations and has exercised its authority and determined that the district court was correct and the state is correct in that, in improving the state plan, eliminating these optional Medicaid benefits. Let me ask you a little more about that now. You said that ruling is entitled to Chevron deference, right? By CMS, yes, Your Honor. By CMS. Now, first of all, how do we know what the ruling is? Is it published somewhere? Is there a book of CMS rulings or is there an opinion or we just take your word for it or what? No, Your Honor. The state submits state plans to CMS and then CMS notifies the state that their plan amendment has either been approved or disproved. Is there somewhere in the record that shows us what CMS did? No. They said, no, we construe this statute to mean so and so and all that? Yes. Well, there is the . . . In approving the state plan amendment. Do we have that in the record? What is in the record, and I believe that the panel approved the request for judicial notice by the appellants, included the actual amendments, the actual language of the amendment. When you say the amendment, what amendment? Well, the state plan is about as big as this courtroom. Just what is the . . . The amendment is, so it's pages and it lists and shows exactly what is being changed in the state plan and the state is notified. But what I'm getting at is, do we have anything to show us the CMS's, you know, reasoning process in reaching that result? In other words, you know, one of the factors we have to apply in whether to grant Chevron deference is, you know, I mean, how rational is this, right? Right. But the problem is CMS isn't here, and if CMS should be here . . . Well, that's exactly the problem I'm getting at. But you also say, well, you don't take the position that that ruling has mooted this case, right? You think this case should go on. It's not mooted because there's a retroactive component to this, so the state is actually entitled to recoup overpayments that it made during the time of the injunction. So the state's position is, so this case should continue, and at the same time, this court is bound to give Chevron deference to the CMS ruling. Yes, based on this panel, I mean, this court's . . . Now, but, you know, how do we know what the ruling is? I mean, just like, sorry, you know, if we got an opinion from the Supreme Court that just said affirmed, right, how do we know what the ruling is? Well, we can't . . . You just adopted your plan, but, you know, how did it go through the reasoning, you know, which definition of physician services apply and so forth? How do we know the reason that CMS followed? Isn't that . . . don't we need to know that in order to decide whether it's entirely Chevron deference? I don't believe so, based on the Alaska case, which has said that CMS's decision about these kinds of state plan amendments is entitled to Chevron deference. We're entitled to . . . Well, I haven't read Alaska, to be honest with you, so I don't know exactly what amendment was involved there, how explanatory it was, you know, what the court knew about what CMS did. But you're telling us, I mean, we should go strictly by the fact that CMS approved the amendment. Well, I'm saying . . . And that's enough. It means because they took the same position that you take, in other words, that, you know, what physician service can . . . now covers under the state plan after the amendment. I mean, that's enough. Yes, based on how Congress is giving HHS and CMS the authority to make exactly those kinds of decisions, because they're the experts in all this very complicated . . . I know they're giving the authority, but still, I mean, the court is not supposed to rubber stamp that. We have to . . . don't we have to have some basis to know whether or not Chevron deference is entitled? Yes, and that's why I'm arguing that this is the wrong vehicle and the wrong defendant now. Well, if it's the wrong vehicle, we should dismiss the case. Well, I think the court can just affirm Judge Damrell's decision with regard to this issue, and then if the appellants want to challenge CMS's approval and bring an APA action, they may do so. All right. But this case is finished. Here. Well, you see . . . now you're saying it's finished, but at the same time, I think in your reply brief, you say, well, no, the case should continue. Well, I'm not saying finished in the sense of the judge . . . this court should affirm Judge Damrell's decision on this issue. It's not . . . because we have the . . . we are entitled to seek recoupment. Whether we would or not is another story, but we're still entitled to for some period during the injunction. You're saying that the plan being accepted or approved is significant? Extremely. It entirely changes the landscape. I understand. I just . . . your opposing counsel says it's not. I think we would benefit from supplemental briefing in light of the acceptance of the plan or approval of the plan from both sides on how we should then proceed. I'd like for both sides to lay that out for us, consistent with the questions, and maybe you feel like you have, or this Alaska case, citing to it in the briefing is enough. I think in light of the current posture of this case, it would probably benefit all if we had a more targeted view of each party's position and authority as to how to proceed in light of the approval. Somebody will issue an order here directing the supplemental briefing. I'd be happy to do that. Okay. Thank you. Thank you. You have a few minutes. I think about six or five. I don't remember. Five. Thank you. Give that to the clerk, please. Thank you. Thank you, Your Honor. This is not the wrong vehicle against the wrong defendant. The appellants in this case had a Section 1983 action against the state for violating federal law. That action is still viable. That action went through the proper channels. When you say action, at this point, what remedy are you seeking? We are seeking an injunction that requires the state to reimburse FQHCs and RHCs when they provide Medicaid services to... But you don't need an injunction. We basically are... In considering whether the injunction should issue, we don't have to give deference to the fact that the plan has been amended now, so what they're doing is in accordance with the state plan? Yes, Your Honor. It's our contention that no deference needs to be given. When CMS disapproves a state plan, as I believe was the case in the Alaska case, there is a remedy, an administrative remedy available to the state to challenge that. And that remedy is not available to beneficiaries or to providers to challenge the approval of a state plan. So it's an entirely different situation when you have the state appealing the disapproval and then you do build a record. Here, as Your Honor pointed out, there is no record. There's a one-page, two-paragraph letter that says your state plan is approved. So that kind of letter is certainly not entitled to Chevron deference because there is no formal adjudication or rulemaking, which are the requirements before the court gives Chevron deference to an agency action. And we would contend it's not even entitled to Skidmore deference, which is the kind of deference that is given to informal agency actions. And Skidmore deference, moreover, merely means you give deference to the extent the federal action and the agency's reasoning has the power to persuade. Here there is no power. Anyway, you're going to brief all that. Okay. If I could just briefly mention then the motion to augment the record, because the court did defer ruling on that pending this hearing today. And frankly, that does speak to the issue of what CMS's real position is, what DHS's real position is, and what the correct and statutory construction of the Medicare and Medicaid laws should be as applied in this case. Now, may I just ask to clarify for my own understanding of this case, such as it is, are you saying that if the CMS approves a plan, there's no right of appeal? There's no administrative right of appeal. Only if it... Only through the Administrative Procedures Act, I'm sorry. But there's no administrative appeal built into the CMS approval process that would allow a beneficiary or provider to appeal short of a Section 1983 action if they had one, or an APA action if they had one. Just a minute, though. But after the plan is approved, can you file an APA challenge in the courts? I believe that you could, Your Honor, under the right circumstances. That might actually be challenged by the defendant saying you don't have an APA action. Have you done that? No, Your Honor, because we don't believe that we have to. There's no preference or no statement within the APA or Section 1983 that says when a party has both of those remedies available to it, they have to exercise their cause of action under the APA. These are two distinct causes of action. There is some case law on that, though. Some case law that says, at least in some circumstances, if you have a right to APA review, you don't have a 1983 case. You know, I actually am not aware of that. I can't tell you in what context, but, all right, anyway, go ahead. So anyway, your position now is you believe you didn't have to file an APA challenge. Why? Because you have this case pending? Because we have this case pending because this is a perfectly valid alternative cause of action to challenge the law that's at issue here. I should point out the opposing counsel indicated that you do have an APA action. Well, that's the first time I heard of it. So that's nice to know in the event that we have to go back, but the Seventh Circuit said in the Voorhees v. Naper Arrow Club case 272, Fed 3rd, 398, that plaintiffs are normally the masters of their own cases and can choose which claims they wish to present, and that is the philosophy under which we believe that the court is not to dictate to a plaintiff who has alternative viable causes of action which one they must proceed under. Thank you. Oh, thank you. Very much. Thank you all for your helpful arguments here today. The case is now submitted.
judges: Nelson, Tashima, Murguia